IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **POWER AUTHORITY OF THE STATE OF NEW YORK,** Plaintiff, v. **THE UNITED STATES,** Defendant. | No. 00-703C (Chief Judge Damich) |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ACCEPTANCE RATE AND RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF**

Alex D. Tomaszczuk
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102
(703) 770-7940
(703) 770-7901 (fax)
Counsel of Record for Plaintiff
Power Authority of the State of New York

Of Counsel:

Jay E. Silberg
Devon E. Hewitt
Michael G. Lepre
Daniel S. Herzfeld
Jack Y. Chu
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

May 20, 2004

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iv

SUMMARY OF THE ARGUMENT ..... 2

I. THE GOVERNMENT'S ARGUMENT THAT THE STANDARD CONTRACT SHOULD BE INTERPRETED AS A REGULATION IS UNPERSUASIVE ..... 7

A. The Government, The Courts, The Utilities And Congress All Acknowledge That The Standard Contract Is A Contract And Not A Regulation ..... 7

B. Application Of The Rule Of *Contra Proferentum* Is Appropriate In This Case ..... 11

II. THE "SCHEDULE TERMS" OF THE STANDARD CONTRACT, BY THEMSELVES, DO NOT YIELD AN APPROPRIATE AND BINDING ACCEPTANCE RATE ON WHICH THE COURT CAN RELY IN DETERMINING BREACH OF CONTRACT DAMAGES ..... 13

A. The Schedule Process Implemented By DOE Did Not Comply With The "Schedule Terms" Set Forth In The Standard Contract ..... 14

B. DOE Did Not Consider Approved DCSs Binding Commitments ..... 17

C. The Standard Contract Does Not Have An "Agreement to Agree" ..... 18

D. The Standard Contract Needs An Acceptance Rate ..... 20

E. The Standard Contract Does Not Contain Equivalent, Bargained-For, Alternate Means By Which DOE May Satisfy Its Acceptance Obligations To Utilities ..... 24

III. THE DCS FORMS SUBMITTED BY UTILITIES OR THE ACRS ISSUED BY DOE CANNOT FAIRLY FORM THE BASIS FOR THE COURT'S DETERMINATION OF DAMAGES ..... 26

A. The ACRs And DCS Forms Reflect An Illegitimate Acceptance Rate ..... 27

1. The Government Misunderstands NYPA's Position ..... 28

2. NYPA Did Not Waive The Right To Challenge The Government's Post-Litigation Characterization Of The ACR And DCS Process ..... 30

B. By Limiting The Analysis To ACRs and DCSs, Many Utilities Will Not Be Fully Compensated For Their Losses From DOE's Breach ....................32

IV. THE RECORD SUPPORTS NYPA'S CONTENTION THAT THE INTENT OF THE PARTIES WAS THAT DOE WOULD ADOPT AN ANNUAL ACCEPTANCE RATE OF 3,000 MTU WHEN IT BEGAN TO DISPOSE OF SNF AND/OR HLW UNDER THE STANDARD CONTRACT ....................33

A. The NWPA's Findings Are Consistent With The Parties' Intent That The Utilities Would Not Have To Build Any Additional At-Reactor Storage And That The Backlog Would Begin To Be Eliminated After 1998....................34

B. DOE's Pre-Litigation Conduct Is The Best Evidence Of Its Intent As To How It Planned To Implement An Acceptance Schedule And, Therefore, Such Conduct Is Significant To The Court's Interpretation Of The Standard Contract ....................36

C. The Acceptance Rates In The 1991, 1992 And 1995 ACRs Do Not Satisfy The Twin Objectives Of The NWPA And The Standard Contract....................39

V. THE GOVERNMENT'S ARGUMENTS IN ITS SUPPLEMENTAL BRIEF ARE NOT PERSUASIVE....................40

A. The Court Of Federal Claims' Prior Decisions Do Not Render The Standard Contract Impossible To Perform ....................40

B. The 3,000 MTU Acceptance Rate Is Supported By The Record....................43

C. This Court Is Obligated To Supply The Missing Acceptance Rate Term....................45

CONCLUSION....................50

# TABLE OF AUTHORITIES

## **Cases & Decisions**


Ala. Power Co. v. U.S. Dep't of Energy, 307 F.3d 1300 (11th Cir. 2002)..........................5, 7, 48

Alvin Ltd. v. United States Postal Serv., 816 F.2d 1562 (Fed. Cir. 1987) ..................................37

Atacs Corp. v. Trans World Communications, Inc., 155 F.3d 659 (3d Cir. 1998).......................47

Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568 (Fed. Cir. 1991) ........19, 47

Blough v. United States, 17 Cl. Ct. 186 (1989) ..................................................................12

Bowen v. Georgetown Univ. Hosp., 488 U.S. 204 (1988) .........................................................11

Brown v. United States, 195 F.3d 1334 (Fed. Cir. 2000) ............................................................11

Commonwealth Edison Co. v. U.S. Dep't of Energy, 877 F.2d 1042 (D.C. Cir. 1989)........ *passim*

Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003) ................................ *passim*

Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302 (Fed. Cir. 1998) .......................................48

Crown Laundry & Dry Cleaners, Inc. v. United States, 29 Fed. Cl. 506 (1993)..............37, 38, 45

David Nassif Assocs. v. United States, 557 F.2d 249 (Ct. Cl. 1977) ....................................23, 45

First Nationwide Bank v. United States, 48 Fed. Cl. 248 (2000) ..........................................45, 46

Hercules, Inc. v. United States, 292 F.3d 1378 (Fed. Cir. 2002)..................................................45

Hills Materials Co. v. Rice, 982 F.2d 514 (Fed. Cir. 1992)...........................................................8

Honeywell, Inc. v. United States, 661 F.2d 182 (Ct. Cl. 1981) ................................................8, 10

Howell v. United States, 51 Fed. Cl. 516 (2002) ..........................................................................46

Indiana Mich. Power Co. v. U.S. Dep't of Energy, 88 F.3d 1272 (D.C. Cir. 1996)............. *passim*

Indiana Mich. Power Co. v. United States, 57 Fed. Cl. 88 (2003) ...................................... *passim*

Ins. Co. v. Dutcher, 95 U.S. 269 (1877) ........................................................................................38

Instruments for Indus., Inc. v. United States, 496 F.2d 1157 (2d Cir. 1974)..................................8

Macke Co. v. United States, 467 F.2d 1323 (Ct. Cl. 1972) ......................................................37, 45

Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000) ... 13, 23, 31, 48

Massengill v. Guardian Mgmt. Co., 19 F.3d 196 (5th Cir. 1994)....47

Massie v. United States, 166 F.3d 1184 (Fed. Cir. 1999)....31

Nat'l By-Products, Inc. v. United States, 405 F.2d 1256 (Ct. Cl. 1969)....36

Northern States Power v. U.S. Dep't of Energy, 128 F.3d 754 (D.C. Cir. 1997)....7, 29, 30, 49

Parker v. Office of Personnel Mgmt., 974 F.2d 164 (Fed. Cir. 1992)....11

Retail Clerks Int'l Ass'n v. NLRB, 510 F.2d 802 (D.C. Cir. 1975)....26

Ridge Runner Forestry v. Veneman, 287 F.3d 1058 (Fed. Cir. 2002)....26

Roedler v. U.S. Dep't of Energy, 255 F.3d 1347 (Fed. Cir. 2001)....8

S.W. Aircraft, Inc. v. United States, 551 F.2d 1208 (Ct. Cl. 1977)....8

Santa Fe Eng'rs, Inc. v. United States, 801 F.2d 379 (Fed. Cir. 1986)....8, 10

Schweigert, Inc. v. United States, 388 F.2d 697 (Ct. Cl. 1967)....8

Semmes Motor, Inc. v. Ford Motor Co., 429 F.2d 1197 (2d Cir. 1970)....13

S. Cal. Edison Co. v. United States, 226 F.3d 1349 (Fed. Cir. 2000)....11, 18

Southern Nuclear Operating Co. v. United States, No. 98-614C,
slip op. (Fed. Cl. April 7, 2004).... *passim*

Tex. Instruments, Inc. v. United States, 922 F.2d 810 (Fed. Cir. 1990)....19

United States v. Seckinger, 397 U.S. 203 (1970)....8, 12

Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. 306 (2002)....31

Yankee Atomic Elec. Co. v. United States, No. 98-126C,
slip op. (Fed. Cl. June 26, 2003).... *passim*

**Statutes, Rules & Regulations**

42 U.S.C. § 10222 (2000)....7

42 U.S.C. § 10131 (2000)....34, 35

10 C.F.R. § 961.11 (2002)....15, 16

48 Fed. Reg. 5,458 (Feb. 4, 1983)....10, 12

48 Fed. Reg. 16,590 (Apr. 18, 1983) ....................12, 22

**Other Authorities**

1 A. Corbin, Corbin on Contracts, § 97 (1963) ....................47

11 A. Corbin, Corbin on Contracts, § 1079 (interim ed. 1979) ....................24

128 Cong. Rec. 26,311 (1982) ....................35

128 Cong. Rec. 27,775 (1982) (remarks of Rep. Bereuter) ....................35

H.R. Rep. No. 97-491, pt. 1, (1982), reprinted in, 1982 U.S.C.C.A.N. 3792 ....................34

Restatement (Second) of Contracts § 204 (1981) ....................21, 22, 37, 48

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **POWER AUTHORITY OF THE STATE OF NEW YORK,** Plaintiff, v. **THE UNITED STATES,** Defendant. | No. 00-703C (Chief Judge Damich) |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ACCEPTANCE RATE AND RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF**

Pursuant to RCFC 56, Plaintiff Power Authority of the State of New York ("NYPA") hereby submits, by its undersigned counsel, this Reply in support of its Cross-Motion For Partial Summary Judgment, which was filed on February 20, 2003. This Reply also responds to the arguments raised by Defendant (the "Government"), in its Reply to Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance and Opposition to Plaintiff's Cross-Motion For Partial Summary Judgment On The Acceptance Rate dated April 11, 2003[1] and its Supplemental Brief dated May 10, 2004. The parties' briefing of the acceptance rate issue was suspended as a result of the stay entered by the Chief Judge on April 16, 2003. This stay was lifted per the Chief Judge's January 30, 2004 Order.

[1] In its reply brief dated April 11, 2003, the Government has responded not only to the arguments raised in NYPA's opposition and cross-motion, but to those arguments raised by other plaintiffs in their opposition briefs filed in similar suits before this Court. NYPA addresses some of these additional arguments in this reply brief.

## SUMMARY OF THE ARGUMENT

On June 13, 1983, NYPA and the United States Department of Energy ("DOE") entered into a "Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste," commonly known as the "Standard Contract." The Standard Contract provided that, in return for NYPA's payment of substantial fees into a special fund (the Nuclear Waste Fund), DOE would begin to dispose of spent nuclear fuel ("SNF") and high level waste ("HLW") from nuclear utilities by January 31, 1998. In the Government's Reply,[2] the Government makes much of NYPA's and the other utilities' obligation under the Standard Contract and the Nuclear Waste Policy Act ("NWPA") to pay for the costs of DOE's civilian radioactive waste program. Indeed, to hear the Government tell it, the entire purpose of the NWPA was to collect money from NYPA and other nuclear utilities. The Government, however, ignores one significant and salient fact: NYPA and other utilities have fully satisfied their financial obligations under the Standard Contract. NYPA alone has paid over $155 million into the Nuclear Waste Fund over the last two decades. NYPA Complaint ¶ 9 (Nov. 20, 2000).

The Government's Reply also skirts the fact that, in return for the utilities' payment of billions of dollars to DOE, DOE had a reciprocal obligation to the utilities. Instead of acknowledging what one court termed the "quid pro quo" created by the Standard Contract, the Government in this litigation has advanced an interpretation of the Standard Contract that borders on the unconscionable: according to the Government, DOE was and is allowed to decide for itself the extent and nature of DOE's performance required under the Standard Contract.

[2] "Government's Reply" refers to the Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance and Opposition to Plaintiff's Cross-Motion For Partial Summary Judgment On The Acceptance Rate dated April 11, 2003.

The Government defends this extreme position by arguing that the language of the Standard Contract authorizes DOE to proceed in whatever manner it chooses. But, as NYPA demonstrated in its Opposition,[3] the Annual Capacity Reports ("ACRs") and the Delivery Commitment Schedules ("DCSs") upon which the Government's argument is based, are not, by their very terms, "rate-setting" documents. As DOE expressly stated in the Standard Contract, in the ACRs and DCSs, and in depositions, the ACRs and DCSs were planning tools and were not intended to produce a binding acceptance rate. DOE itself has recognized that an acceptance rate is not contained within the four corners of the Standard Contract. While the Government asserts that the parties agreed to omit the acceptance rate from the Standard Contract, the evidence establishes that the reason an acceptance rate was not included in the Standard Contract was because the Government feared an impasse; specifically, attempting to include such a controversial term would have likely delayed execution of the Standard Contracts in violation of the deadline established by the NWPA. In such circumstances, the Court is properly tasked with deriving a reasonable acceptance rate from extrinsic evidence included in the record.

In its Reply, the Government also asks the Court to ignore the considerable and undisputed evidence demonstrating that the parties intended that DOE would adopt an annual acceptance rate of 3,000 MTU. As NYPA demonstrated, that rate is the rate most likely to achieve the NWPA's and the Standard Contract's twin objectives of (1) ensuring that utilities would not have to build any additional at-reactor storage after 1998 and (2) working off the backlog of SNF and/or HLW already stored on-site as of 1998. The Government contends that all the evidence cited by NYPA in its Opposition should be discarded because the language of

---

[3] "Opposition" refers to NYPA's Opposition to Defendant's Motion for Partial Summary Judgment Regarding The Rate of Spent Nuclear Fuel Acceptance and Cross-Motion for Partial Summary Judgment on the Acceptance Rate filed with the Court on February 20, 2003.

the NWPA does not contain an express finding stating these objectives. While the Government is correct that specific language addressing at-reactor storage is not included in the NWPA, the NWPA does contain findings regarding the "hazards of nuclear waste," "the national problem . . . created by the accumulation of" SNF and/or HLW, and the importance of protecting the "public and the environment." As is explained in greater detail herein, these references are wholly consistent with NYPA's contention that Congress intended that utilities would not need to provide additional at-reactor storage and that DOE would begin to reduce the amount of SNF stored at reactor sites after a date certain, specifically, January 31, 1998.

Finally, the Government argues that the many DOE statements and DOE publications cited by NYPA in its Opposition should be disregarded by the Court because these representations, although fully consistent with NYPA's position on the parties' and the NWPA's intent with respect to the Standard Contract, cannot be considered contractually binding. Again, the Government misunderstands NYPA's point. NYPA is not advocating that the Court adopt an annual acceptance rate of 3,000 MTU because DOE statements and DOE documents themselves obligate DOE to take SNF and/or HLW from utilities at that rate. NYPA offers this extensive evidence to assist the Court in its task of determining an appropriate and reasonable acceptance rate. Courts have uniformly recognized that a party's pre-litigation plans, statements and conduct are often the best evidence of intent. Therefore, while NYPA does not contend that the evidence it offers is itself contractually binding, DOE's past statements and DOE's published documents are plainly relevant to the Court's determination of a reasonable acceptance rate.

In short, the Court should reject the Government's interpretation that the only purpose behind the NWPA and the Standard Contract was the collection of fees from utilities and ensuring that DOE's costs of running the nuclear waste program were borne by the nuclear

utilities. As the United States Court of Appeals for the Eleventh Circuit remarked, in view of previous findings that DOE had breached the Standard Contract and consistent with the "quid pro quo" arrangement set forth therein, "the ultimate burden of the government's breach [should] fall on the government, not [the] other utilities." Ala. Power Co. v. U.S. Dep't of Energy, 307 F.3d 1300, 1314 (11th Cir. 2002). This Court, likewise, must select an acceptance rate that reflects the Standard Contract's *quid pro quo* arrangement. In order to adequately and fairly assess damages, the Court must determine the performance to which the utilities were entitled in return for their payment of billions of dollars to DOE in support of the nuclear waste program. According to the Government, the Standard Contract left the level of DOE's performance solely to the discretion of DOE. However, the very concept of "quid pro quo" means that NYPA and other utilities are entitled to a tangible, concrete and commensurate obligation on the part of DOE in return for the substantial sums of money that have been and continue to be paid by the utilities to DOE.

There is no genuine dispute that DOE, in attempting to administer the Standard Contract consistent with the purposes of the NWPA, intended to implement a steady state acceptance rate of 3,000 MTU annually in return for the payment of substantial fees by NYPA and other utilities to DOE. Indeed, a number of DOE documents published over the last two decades demonstrate that DOE assessed the adequacy of the fees charged the utilities under the Standard Contract based on an assumption that DOE would take SNF and/or HLW from utilities at a steady-state rate of 3,000 MTU annually. Since NYPA and the utilities paid their fees under the Standard Contract based on this assumption, DOE's reciprocal obligation should similarly be to take SNF and/or HLW at this rate.

As discussed throughout this brief, in each of the four decisions in which the Court of Federal Claims has addressed arguments identical to those raised by the Government here, this Court has rejected the Government's motion for partial summary judgment on the acceptance rate issue. On May 10, 2004, the Government submitted a Supplemental Brief ("Gov't Supp. Br.") which purports to address those decisions.

According to the Government's Supplemental Brief, the Court of Federal Claims' prior decisions denying the Government's motions for partial summary judgment were improper because they rendered the ACR and DCS "schedule terms" meaningless, thereby making the Standard Contract "virtually impossible to perform." As set forth in detail below, these decisions, however, do not challenge the viability of the ACR and DCS procedures as a scheduling mechanism; rather, they recognize that the Government's manipulation of those procedures did not result in a reasonable basis upon which to establish an acceptance rate. The other arguments in the Government's Supplemental Brief – that the 3,000 MTU rate is unsupported by the record and that this Court cannot supply a missing, essential contract term – also are flawed. Moreover, this Court has already granted a spent fuel plaintiff's cross-motion for summary judgment on the acceptance rate, establishing a 3,000 MTU annual acceptance rate as a matter of law. See Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88, 99-100 (2003) ("Indiana Michigan II").

Accordingly, the Court should grant NYPA's cross-motion for partial summary judgment on the spent nuclear fuel acceptance rate and should deny the Government's contrary motion for partial summary judgment on that issue.

## I. THE GOVERNMENT'S ARGUMENT THAT THE CONTRACT SHOULD BE INTERPRETED AS A REGULATION IS UNPERSUASIVE

### A. The Government, The Courts, The Utilities And Congress All Acknowledge That The Standard Contract Is A Contract And Not A Regulation

In the Government's Reply, the Government acknowledges that the Standard Contract executed by DOE and NYPA is a contract. Gov't Reply at 5 ("We completely agree that each Standard Contract executed by an individual utility contract holder . . . is a 'contract' between those parties."); id. at 9 ("we are not arguing, and have never argued, that each Standard Contract that DOE and an owner or generator of SNF and/or HLW executed is not a 'contract'"); id. at 14 ("The terms of the Standard Contract are contained in a contract, and the proper method of interpreting those terms . . . is, regardless of the terminology used, still a question of contract interpretation and a matter of contract law . . . ."). The Government's statements are consistent with the intent of Congress. The NWPA explicitly states that DOE must "enter into contracts" with utilities for the "payment of fees" and the disposal of SNF. 42 U.S.C. § 10222 (2000); see also Northern States Power Co. v. U.S. Dep't of Energy, 128 F.3d 754, 758 (D.C. Cir. 1997) (stating that the NWPA "clearly demonstrates a congressional intent that [DOE] assume a contractual obligation to perform"), *cert. denied*, 525 U.S. 1016 (1998); Alabama Power, 307 F.3d at 1314 (commenting that Congress empowered DOE to negotiate contracts "rather than imposing top-down regulations"). The position taken by the Government in its Reply is also consistent with the arguments made by the Government in its original motion for partial summary judgment. In its original motion, the Government presented arguments that relied on the contract doctrines of "parol evidence," "integration" and "conditions precedent." Indeed, as NYPA pointed out in its Opposition, other than one anomalous case, Commonwealth Edison Co. v. U.S. Dep't of Energy, 877 F.2d 1042 (D.C. Cir. 1989), every court which has considered the

Standard Contract, including the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), has applied contract law principles in its interpretation. See, e.g., Roedler v. U.S. Dep't of Energy, 255 F.3d 1347, 1351 (Fed. Cir. 2001) ("[a]pplying the federal common law that governs the contracts of the United States" in interpreting the Standard Contract), *cert. denied*, 534 U.S. 1056 (2001) (citation omitted).

Notwithstanding the majority of courts' and the Government's affirmation of the Standard Contract as a contract, the Government argues that the Standard Contract should be interpreted as a regulation. Citing a few select cases, the Government argues that, where a contract incorporates a regulation, that portion of the contract that is a regulation should nonetheless be interpreted as a regulation. Commonwealth Edison, 877 F.2d at 1045-46; see also Santa Fe Eng'rs, Inc. v. United States, 801 F.2d 379 (Fed. Cir. 1986); Honeywell, Inc. v. United States, 661 F.2d 182 (Ct. Cl. 1981). However, the principle espoused in Commonwealth Edison, Honeywell and Santa Fe, that regulations incorporated into contracts should be subject to a more deferential standard of interpretation than other contract terms, appears to be a minority view. The majority view is that regulatory contract terms should be interpreted on the same basis as other terms in the contract.[4]

[4] According to the Government, a major distinction between interpreting a contract provision under regulatory principles instead of contract principles is that regulations are not subject to the rule of *contra proferentum* advocated by NYPA in this case. Gov't Reply at 7 n.3, citing Santa Fe, *supra*. Under the rule of *contra proferentum*, ambiguities in contract language are construed against the drafter of the language – in this case, the Government. In many cases, however, the rule of *contra proferentum* is applied even when the contract provision subject to interpretation stems from a regulation. See, e.g., United States v. Seckinger, 397 U.S. 203, 216 (applying the rule of *contra proferentum* against Government and to interpretation of a standard procurement regulation included in government contract); Hills Materials Co. v. Rice, 982 F.2d 514, 516-17 (Fed. Cir. 1992) (same); S.W. Aircraft, Inc. v. United States, 551 F.2d 1208, 1212 (Ct. Cl. 1977) (same); Schweigert, Inc. v. United States, 388 F.2d 697, 700-01 (Ct. Cl. 1967) (same); Instruments for Indus., Inc. v. United States, 496 F.2d 1157, 1161 (2d Cir. 1974) (same).

Moreover, in previous decisions in which the Court of Federal Claims has addressed the very question at issue here, the Court has interpreted the Standard Contract as a contract, not a regulation. For example, in Indiana Michigan II, Judge Hodges found: "Congress was free to set up an entirely different system to finance and to monitor nuclear waste collection, according to normal regulatory procedures. The system that Congress chose in this case created contractual relationships among the parties." Indiana Michigan II, 57 Fed. Cl. at 96. Accordingly, Judge Hodges held that the Standard Contract should be interpreted "according to established contract principles." Id. In fact, Judge Hodges pointed out that the D.C. Circuit's decision in Commonwealth Edison (on which the Government relies) was "an exceptional case," and that several years after it decided Commonwealth Edison the D.C. Circuit actually "rebuffed DOE's efforts to interpret the Standard Contract by regulation." Id. at 95 (citation omitted). Judge Hewitt likewise applied the law of contract interpretation to the Standard Contract in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), finding that Federal Circuit decisions are "consistent with the view that the Standard Contract is to be interpreted as a contract rather than a regulation in a suit for damages for breach." Commonwealth Edison, 56 Fed. Cl. at 660.

The principle that deference should be afforded the Government's interpretation of regulatory contract provisions, moreover, is inapplicable to this case. The Government, the courts, Congress and the utilities all consider the Standard Contract a contract, not a regulation. The fact that DOE chose to publish the contract in the Federal Register and to invoke notice and comment procedures typically used for regulations does not convert the Standard Contract into a regulation. As the D.C. Circuit in Commonwealth Edison itself acknowledged, "the mere appearance of a standard form in the Code of Federal Regulations does not perforce eliminate its

identity as a contract." Commonwealth Edison, 877 F.2d at 1045. DOE, too, has admitted that, given the short timeframe in which DOE had to execute contracts with all utilities,[5] it used the notice and comment procedures for negotiation of the Standard Contract as a matter of convenience; that process presented "the best opportunity for interested persons, particularly the affected parties, to participate." 48 Fed. Reg. 5,458, 5,459 (Feb. 4, 1983); Appendix to Plaintiff's Opposition to Defendant's Motion For Partial Summary Judgment Regarding The Rate Of Spent Nuclear Fuel Acceptance And Cross-Motion For Partial Summary Judgment On The Acceptance Rate ("Pl. App.") at 166. Accordingly, the principle for which Honeywell and its progeny stands, that a regulation incorporated into a contract should be interpreted as a regulation, does not apply in this case as there is no "regulation" that qualifies for such deferential interpretation.

In addition, the Government has blurred a major distinction between the facts of this case and the facts of cases such as Honeywell and Santa Fe. In Honeywell and Santa Fe, the contracts incorporated a portion of an established set of agency regulations that were promulgated separate and apart from the contract at issue. The provision in dispute in those cases, furthermore, was a subset of a larger set of regulations. In those circumstances, the courts' position that the regulatory provision should be interpreted consistently with the other regulatory provisions and with the purposes behind the regulatory scheme as a whole may have been reasonable since the regulations existed before and were issued without regard to the particular contract in question.

In this case, the opposite is true. Nearly the entire Standard Contract was published in the Federal Register and, if the Government's argument is taken to its logical conclusion, must be

[5] See NYPA Opposition at 23-24 n.5.

considered the "regulation." The regulatory contract provision at issue in this case, therefore, is not part of an external agency regulation that should be interpreted in a manner consistent therewith; instead, the regulation and the contract are one and the same. Deferential interpretation of the Government's promises, therefore, is not an objective exercise; rather it is tantamount to taking the side of the Government in the dispute. For this reason, most courts will not defer to the Government's interpretation of a regulatory contract provision where the Government has an "economic stake" in the outcome of or is an adverse party in the litigation at issue. See, e.g., S. Cal. Edison Co. v. United States, 226 F.3d 1349, 1357 (Fed. Cir. 2000) ("such deference could lead the courts to endorse [the Government's] self-serving post-hoc reinterpretation of contracts"); see also Brown v. United States, 195 F.3d 1334, 1340 (Fed. Cir. 2000) (applying *de novo* review rather than deference to interpretation of agency regulation incorporated in a contract); Parker v. Office of Personnel Mgmt., 974 F.2d 164, 166 (Fed. Cir. 1992) ("post-hoc rationalizations will not create a statutory interpretation deserving of deference"). As previously noted by the Supreme Court, a court's deference "to what appears to be nothing more than an agency's convenient litigating position" is entirely inappropriate. Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 213 (1988).

For these reasons, this Court should interpret the Standard Contract as a contract, not a regulation.

### B. Application Of The Rule Of *Contra Proferentum* Is Appropriate In This Case

NYPA noted in its Opposition that the Supreme Court has held that the principle of *contra proferentum* "is appropriately accorded considerable emphasis" in cases where the Government was the drafting party "because of the government's vast economic resources and

stronger bargaining position in contract negotiations." Blough v. United States, 17 Cl. Ct. 186, 189 (1989) (quoting Seckinger, 397 U.S. at 216). As an argument of last resort, the Government contends that the application of the rule of *contra proferentum* is inappropriate in this case because the nuclear industry was involved in the development of the Standard Contract, "drafting many of the provisions that appear in the Standard Contract." Gov't Reply at 17.

The Government's contention that the Standard Contract was a document jointly drafted by DOE and the nuclear industry is an exaggeration. Various industry groups did meet with DOE before the proposed terms of the Standard Contract were published in the Federal Register and did suggest alternate language. Government Supplemental Appendix ("Gov't Supp. App.") at 612-13. As is readily apparent by comparing the industry's written comments on the proposed rule with the proposed terms of the Standard Contract actually published in the Federal Register, DOE only incorporated a small fraction of the suggestions submitted by industry advocates.[6]

Furthermore, while the nuclear industry also submitted numerous comments to and had countless discussions with DOE regarding the proposed terms of the Standard Contract after their publication in the Federal Register, when it published the final terms of the Standard Contract DOE itself admitted that the terms set forth in the "final rule [remained] essentially the same as that described in the proposed rule." 48 Fed. Reg. 16,590, 16,590 (Apr. 18, 1983); Pl. App. at 180. In fact, as the D.C. Circuit in Commonwealth Edison observed, the nuclear industry "had no real choice but to agree to whatever terms the federal government offered."

[6] Indeed, to the extent DOE accepted any suggestions from the nuclear industry, DOE did so almost exclusively in regards to the provisions addressing DCS submissions. However, the suggestions accepted by DOE were almost purely editorial and did not reflect any substantive departure from DOE's original language. Compare Letter from S.P. Kraft, Edison Electric Institute, to Robert J. Mullen (Jan. 24, 1983), Gov't Supp. App. at 622-64, with 48 Fed. Reg. 5458, 5458-71 (Feb. 4, 1983), Pl. App. at 165-78.

Commonwealth Edison, 877 F.2d at 1045; see also Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1337 (Fed. Cir. 2000) (noting that the NWPA made "the entry of [the Standard Contracts] mandatory for the utilities"). Accordingly, application of the rule of *contra proferentum* is more than warranted in this case. See Semmes Motor, Inc. v. Ford Motor Co., 429 F.2d 1197, 1207 (2d Cir. 1970) (stating that "the rule of 'construction against the draftsman' applies with particular force 'in cases of standardized contracts in cases where the drafting party has the stronger bargaining position'") (citation omitted).

## II. THE "SCHEDULE TERMS" OF THE STANDARD CONTRACT, BY THEMSELVES, DO NOT YIELD AN APPROPRIATE AND BINDING ACCEPTANCE RATE ON WHICH THE COURT CAN RELY IN DETERMINING BREACH OF CONTRACT DAMAGES

The Government argues that the Court should not ascertain an acceptance rate from extrinsic evidence because the parties agreed in the Standard Contract to "schedule terms" that would yield a delivery acceptance schedule. In the case of NYPA, the Government contends that these "schedule terms" resulted in approved DCSs for the year 2001. Defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance at 20 (Nov. 28, 2001). The Government concludes that NYPA's damages resulting from DOE's breach of the Standard Contract should reflect DOE's failure to accept the SNF identified in these DCSs approved by DOE. The Government's argument that the Court should rely on the approved DCSs produced in accordance with the "schedule terms" of the Standard Contract, however, is severely flawed.

The "schedule terms" in the Standard Contract, as now identified by the Government, did not, in fact, yield the DCSs on which the Government asserts NYPA's breach of contract damages should be assessed. Rather, DOE unilaterally imposed key schedule terms of its own.

Similarly, the Government's contention that approved DCSs were binding commitments is false; the evidence indicates that the Government did not consider approved DCSs binding on the Government. For this reason, the schedule terms also cannot be regarded as an "an agreement to agree," as now argued by the Government. Accordingly, the Government is incorrect that the "schedule terms" of the Standard Contract, in and of themselves, provide sufficient information from which the Court can ascertain the appropriate acceptance rate for calculating breach of contract damages in this case. In order to accurately assess damages, the Court must determine the acceptance rate, a term which both parties acknowledge is missing from and should be included in the Standard Contract.

### A. The Schedule Process Implemented By DOE Did Not Comply With The "Schedule Terms" Set Forth In The Standard Contract

The Government claims that the Standard Contract creates a "contractual mechanism" for development of a utility's specific acceptance schedule. Gov't Reply at 24. This "contractual mechanism" allegedly has two phases; the first phase includes the issuance of an ACR and an APR by the Government and the second phase includes the submission and negotiation of DCSs and Final Delivery Schedules ("FDSs") by the utilities. Id. at 24-25. Again, because these "schedule terms" are allegedly spelled out clearly in the Standard Contract, the Government argues that the Court should not itself establish an acceptance rate for the purpose of determining damages.

The principal flaw in the Government's position is that the process actually established by DOE did not, in fact, comport with the "contractual mechanism" described by the Government and supposedly set forth in the Standard Contract. While DOE initially issued ACRs annually that projected, for planning purposes, the receiving capacity of the facility that

DOE intended would store SNF, DOE unilaterally stopped issuing ACRs in 1995. As of 1991, furthermore, the acceptance rates listed in the ACRs were counterfeit.[7] Consistent with the Standard Contract, utilities began submitting DCSs in 1992. Contrary to the Standard Contract, however, utilities were not allowed to submit DCSs identifying "all SNF and/or HLW [they wished] to deliver to DOE" as provided by the Standard Contract. See 10 C.F.R. § 961.11, Art. V(B)(1). Instead, in an instruction form generated by DOE independently from the Standard Contract, DOE dictated the amount that the utilities could offer for acceptance to DOE in the DCS forms.

Specifically, in the 1991 ACR, DOE stated quite firmly that DOE would only approve DCS forms submitted in 1992 that were limited to the allocations set forth in the 1991 ACR. PFUF ¶ 130. Shortly thereafter, DOE issued separate instructions to utilities regarding the completion of the DCS forms. PFUF ¶ 132. These instructions repeated the admonition contained in the 1991 ACR to the effect that DOE would not approve the DCS forms submitted unless the amounts identified for delivery to DOE reflected the annual allocations set forth in the most recent ACR, at that time, the 1991 ACR. Id. These instructions, however, were completely at odds with the procedures set forth in the Standard Contract. As the Court held in Indiana Michigan II, "[t]he Standard Contract does not permit defendant to limit plaintiff's substantive rights in the guise of 'instructions.'" Indiana Michigan II, 57 Fed. Cl. at 98. Moreover, in

[7] As argued in NYPA's Opposition, the rates and allocations set forth in the ACRs published by DOE in 1991, 1992 and 1995 reflected acceptance at an MRS, as limited by the 1987 Amendments to the NWPA ("Amendments Act"). At the time DOE published the first ACR in 1991, however, DOE did not satisfy the legal conditions required for construction of such a facility. DOE also improperly applied the Amendments Act MRS capacity limits over the twelve-year period of DOE's anticipated breach, rather than the nominal three to five years originally contemplated by Congress. See NYPA Opposition at 59-63; Proposed Findings of Fact ("PFUF") ¶ 74.

Commonwealth Edison Judge Hewitt questioned how, in light of DOE's instructions requiring utilities to submit DCSs reflecting the same allocation set forth in the ACR, DOE "intended in good faith to carry out the negotiating and revising aspects of the DCS process." Commonwealth Edison, 56 Fed. Cl. at 665. Accordingly, Judge Hewitt found that "DOE's use of the 1991 ACR to limit the amount of SNF requested by the utilities in their DCS submissions may be a breach of defendant's duty of good faith and fair dealing." Id.

The Standard Contract neither stated nor contemplated that the ACR would provide the basis for the DCS process; as noted in NYPA's Opposition, there is absolutely no link between the ACR process and the DCS process in the language of the Standard Contract.[8] The Standard Contract expressly states that the information included in the ACR is for "planning purposes." DOE reiterated this view in each of the ACRs it published, emphasizing that the information contained therein was "for planning purposes only and, thus, [was] not contractually binding on either DOE or the Purchasers." PFUF ¶ 81. Indeed, in a case with facts similar to NYPA's, DOE even conceded during oral argument that the ACRs were for planning purposes. See Commonwealth Edison, 56 Fed. Cl. at 666.

Accordingly, the "contractual mechanisms" and "schedule terms" described by the Government and allegedly contained in the Standard Contract do not, in and of themselves, result in the approved DCSs on which the Government argues NYPA's damages calculations should be based. NYPA's approved DCSs were the product of the Government's manipulation of the unrelated ACR and DCS terms set forth in the Standard Contract and the Government's

[8] The Standard Contract does state that after DOE publishes its annual *APR*, the utilities were to submit the DCS forms. See 10 C.F.R. § 961.11, Art. V(B)(1) (2002); PFUF ¶ 126. The APR and the ACR, however, are two distinct documents.

unilateral imposition of an unacceptable and counterfeit acceptance rate through its instructions to utilities.

### B. DOE Did Not Consider Approved DCSs Binding Commitments

According to the Government, once DOE approved the DCSs submitted by the utilities, the approved DCSs represented binding commitments by both parties. Most importantly, the Government contends that an approved DCS represented the Government's commitment to accept the amount of SNF identified in the approved DCS. For this reason, the Government argues the approved DCSs must serve as the basis for the computation of NYPA's breach of contract damages in this case.

The Government's argument conveniently ignores the critical fact that not even DOE considered the approved DCSs to be binding. Every ACR issued by DOE expressly stated that the information contained therein "is not contractually binding on either DOE or the Purchasers." PFUF ¶ 81. Indeed, in its Reply the Government itself states: "[w]e agree that the ACRs were issued for planning purposes . . . ." Gov't Reply at 51 n.30. The Government also admits in its Reply that "DOE could issue new ACRs that contained different proposed acceptance schedules." Id. Similarly, in the instructions issued by DOE to utilities regarding the completion of the DCS forms, DOE again explicitly advised utilities that "all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers." PFUF ¶ 135. DOE, in fact, did take it upon itself to "reevaluate" previously approved DCS forms. In the first quarter of 1997, DOE unilaterally voided a number of utility DCS submissions that had *already been approved* by both the then-Contracting Officer, Beth Tomasoni, and her technical representative at that time, David Zabransky. PFUF ¶ 144.

Moreover, this Court has recognized that DOE did not consider the ACR and DCS procedures to be binding:

> The Contract contemplated that DOE would use these reports for planning purposes only. The Capacity Reports disclaimed any other purpose, stating that they were not binding on either party.

Indiana Michigan II, 57 Fed. Cl. at 98 (citation omitted). Accordingly, it is clear that "[t]he parties could not have expected that planning documents would create binding contractual obligations." Commonwealth Edison, 56 Fed. Cl. at 666.

Thus, while the Government for litigation purposes claims that the "schedule terms" resulted in binding schedule commitments, it is apparent that DOE, in fact, did not consider them so.[9]

**C. The Standard Contract Does Not Have An "Agreement to Agree"**

According to the Government, the "contractual mechanism" and "schedule terms" included in the Standard Contract created a process by which the parties agreed to negotiate and agree later on a delivery commitment schedule. Gov't Reply at 26. This "agreement to agree" argument was raised for the first time in the Government's initial reply and should be considered yet another one of the Government's "self-serving post-hoc reinterpretations" of the Standard Contract. See S. Cal. Edison, 226 F.3d at 1357. This eleventh hour argument must fail for a number of reasons.

[9] The Standard Contract also contemplated that the utilities would submit Final Delivery Schedules after the DCS submissions. As explained in NYPA's Opposition, the FDS submissions could reflect more or less SNF than that identified on the initial DCS forms as well as identify SNF from a completely different site or utility. See NYPA Opposition at 46-47.

First, as discussed in greater detail below, the parties did not have a "meeting of the minds" on the issue of whether the Standard Contact would contain an acceptance rate or whether they would defer negotiation and resolution of the acceptance rate until a later time. Tex. Instruments, Inc. v. United States, 922 F.2d 810, 815 (Fed. Cir. 1990). Second, even if the parties had agreed to agree later, they, in fact, did not do so. As noted above, although many utilities had their submitted DCSs approved, DOE did not consider approved DCSs binding and actually voided some previously approved DCS forms.

Finally, even if the Court considers the Standard Contract to include an "agreement to agree," here, too, DOE failed to comply with this "agreement." According to the Government, an "agreement to agree" is considered valid because it creates "an obligation, upon both parties, to attempt to agree in good faith upon specific delivery and acceptance commitments." Gov't Reply at 26 (emphasis in original). The Government further states that an "agreement to agree" will be upheld because it places an obligation "on the parties to negotiate in *good faith*." Id. (quoting Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991)) (emphasis in original). DOE, however, did not allow, permit or engage in *any* negotiations regarding the amount of SNF identified for acceptance in submitted DCS forms. Instead, DOE instructed utilities to use the allocations set forth in the most recently issued ACR in submitting the DCS forms. In the instructions, moreover, DOE expressly stated that the total quantity of SNF designated for delivery in a DCS could not exceed the ACR allocation; "exceeding the allocation [would] result in disapproval of the DCS(s)." Government Appendix ("Gov't App.") at 150. DOE, in fact, summarily rejected any DCS forms that did not reflect the ACR allocations. See, e.g., Gov't App. at 431 ("These DCSs were disapproved, in part, because the Department determined that Item 2.7 (Metric Tons Uranium) of each DCS was incorrectly

completed; specifically NYPA exceeded its acceptance capacity allocations for each DCS."). The requirement that the quantity of SNF designated for delivery in a DCS could not exceed the ACR allocation was "inconsistent with plaintiff's justified expectation that the ACRs were negotiable . . . ." Commonwealth Edison, 56 Fed. Cl. at 666. Thus, while the Government contends that the Standard Contract provided for a process that would allow the parties to negotiate a delivery schedule in the future, DOE did not, in fact, interpret the Standard Contract in that manner.

**D. The Standard Contract Needs An Acceptance Rate**

As demonstrated above, the "schedule terms" in the Standard Contract do not yield and did not yield an acceptance schedule on which the Court can rely in computing damages in this case. The DCSs approved by the Government in this case and other pending SNF cases were the result of a process established by the Government which involved the manipulation of various terms of the Standard Contract and, most importantly, DOE's unilateral imposition of an artificial acceptance rate.

The Standard Contract needs an acceptance rate. As stated in the Standard Contract, the ACRs were for planning purposes. They functioned as long-term guidelines for utilities but were not intended to serve as the basis of the parties' commitments to one another regarding the delivery of SNF and/or HLW. The DCS forms also were planning documents. These forms identified to the Government the location, type, age and nature of the fuel that would be delivered to the Government within a certain timeframe. The forms also served as the basis for the exchanges or "swaps" that were expected to occur among utilities. The Standard Contract did provide that, in the DCS form, the utility would identify the SNF and/or HLW the utility "[wishes] to deliver" to DOE. In this regard, the utility was to identify the location, type, age,

and nature of the fuel that it "[wishes] to deliver" to DOE 63 months thereafter, but the DCS form itself was never intended to establish the *amount* it wished to deliver. Similarly, through the process of negotiation with DOE, exchange of DCSs with other utilities, and submission of FDSs, the utility was to finalize the location, type, age and nature of fuel that DOE would accept 63 months thereafter. The amount of SNF the utility would deliver also would be finalized, but only within the twenty-percent range permitted under the FDS provisions set forth in the contract.

As DOE itself recognized when it required the utilities to use the acceptance rates in the ACRs and as the Government later recognized in this case, the "schedule terms" in the Standard Contract do not provide for an acceptance rate. See 1987 Annual Capacity Report, Pl. App. at 428 ("The Contract makes no provisions for minimum amount of SNF that DOE will accept and transport in a given period."); see also Defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance at § III.A.1.b. (Nov. 21, 2002) ("The Standard Contract itself does not expressly identify a required rate by which DOE had to accept contract holders' SNF and/or HLW under the contract."); Gov't Reply at 35 ("[T]he Standard Contract does not specify an acceptance schedule or rate . . . ."). Judge Hodges reached the same conclusion, finding that "[t]he [Standard Contract] does not use Annual Capacity Reports and Delivery Commitment Schedules to determine an Acceptance Rate." Indiana Michigan II, 57 Fed. Cl. at 98. The Government, however, objects to the characterization of the acceptance rate as a "missing" or "omitted" term.

Specifically, citing the Restatement, the Government argues that a missing term is omitted from a contract when the parties "fail to foresee the situation which later gives rise to the dispute." Restatement (Second) of Contracts § 204 (1981). According to the Government, "the

record of administrative rulemaking . . . plainly refutes any argument that the parties simply overlooked, forgot to include, or accidentally 'omitted' a specific acceptance schedule or rate in the Standard Contract." Gov't Reply at 23. The Government explains that representatives of the nuclear industry submitted comments asking DOE to include an acceptance rate in the Standard Contract. In publishing the final rule, DOE stated all comments on the proposed terms of the Standard Contract "were carefully reviewed and fully considered in the formulation of this final rule." 48 Fed. Reg. at 16,590 (Apr. 18, 1983); Pl. App. at 180. According to the Government, this statement, combined with the fact that DOE did not include an acceptance rate in the Standard Contract, indicated DOE's position that it would not be obligated to take SNF and/or HLW at any particular rate when it began to dispose of SNF and/or HLW under the Standard Contract.

The Restatement cited above and by the Government in its Reply does not, however, limit the definition of a "missing" term to one omitted due to a failure to foresee; a "missing" term may also be omitted from a contract "because discussion of it might be unpleasant or might produce delay or impasse." Restatement (Second) of Contracts § 204, cmt. b (1981). The Government ignores the fact that DOE did address, in detail, a number of the more substantive and important comments submitted by the nuclear industry regarding the proposed terms of the Standard Contract. The Government also ignores the fact that DOE did not even acknowledge receipt or the existence of the comments regarding the acceptance rate in the final rule, while it did acknowledge receipt of many other comments. DOE also did not explain the reason for the omission of the acceptance rate from the final rule, while it did explain the reasoning behind DOE's rejection of other, less controversial comments. Given (1) the short timeframe in which DOE was required to have the contracts executed, (2) the fact that the utilities had to sign the

contracts or risk losing their operating licenses,[10] and (3) the fact that DOE basically ignored the acceptance rate issue when it implemented the Standard Contract, the evidence suggests that the acceptance rate was omitted from the Standard Contract in order to avoid confrontation and impasse.[11]

As Judge Hodges stated in Indiana Michigan II, the acceptance rate term "is missing entirely" from the Standard Contract. Indiana Michigan II, 57 Fed. Cl. at 96. Quoting the Restatement (Second) of Contracts § 204, Judge Hodges found: "'When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.'" Indiana Michigan II, 57 Fed. Cl. at 96. Likewise, in Commonwealth Edison Judge Hewitt held that it was "required . . . to determine the missing acceptance rate term . . . ." Commonwealth Edison, 56 Fed. Cl. at 667 (citing David Nassif Assocs. v. United States, 557 F.2d 249, 258 (Ct. Cl. 1977). Accordingly, notwithstanding the Government's protestations

[10] See Maine Yankee, 225 F.3d at 1337 (noting that the NWPA made "the entry of [the Standard Contracts] mandatory for the utilities").

[11] The Government argues that many of the other plaintiffs "implicitly recognize" that the "schedule terms" are not missing from the Standard Contract. Gov't Reply at 24. In this regard, the Government cites a number of quotes from the other plaintiffs' briefs in which these plaintiffs explain that, at the time the Standard Contract was executed by utilities in 1983, it was difficult to select an exact acceptance rate because DOE was just beginning to plan for the acceptance of SNF fifteen years hence. The Government, however, misinterprets these statements as acknowledgements by the utilities that an acceptance rate is not missing from the Standard Contract. Rather, these statements explain why DOE may have omitted an acceptance rate from the Standard Contract and why negotiation of an acceptance rate on the expedited time frame under which DOE was operating may have led to an impasse.

to the contrary, the acceptance rate is a "missing" or "omitted" term, which the Court must fill with a reasonable one.[12]

**E. The Standard Contract Does Not Contain Equivalent, Bargained-For, Alternate Means By Which DOE May Satisfy Its Acceptance Obligations To Utilities**

In its Reply, the Government states that, because the schedule terms allegedly "provide DOE with the option of selecting any one of numerous potential acceptance scenarios . . . the schedule terms act as a form of 'alternative contract.'" Gov't Reply at 29. As correctly identified by the Government, an "alternative contract" is "one in which a party promises to render some one of two or more alternative performances either one of which is mutually agreed upon as the bargained for equivalent given in exchange for the return performance by the other party." 11 A. Corbin, Corbin on Contracts, § 1079, at 394 (interim ed. 1979). The Government's alternative contract argument, however, fails for a number of reasons.

First, the Government's contention that the Standard Contract's schedule terms "provide DOE with the option of selection of any one of numerous potential acceptance scenarios" is simply false. As noted in every acceptance rate brief NYPA has submitted in this case and as the Government has itself admitted, the Standard Contract does not include an acceptance rate. Accordingly, the Standard Contract also cannot include alternative acceptance rates. The fact is

[12] Furthermore, the Government's contention in this litigation that the Standard Contract is not missing an acceptance rate completely contradicts earlier DOE statements acknowledging this fact. Specifically, shortly after the final rule was published and the individual contracts executed, DOE began planning to amend the Standard Contract to include an acceptance rate. Pl. App. at 566 ("[T]he Department plans to incorporate into its contracts provisions which specify the minimum amount of spent fuel and waste which the Department will be obligated to accept, not later than January 31, 1998."). DOE, however, never completed the task.

that the Standard Contract does not identify any "acceptance scenarios" from which DOE allegedly can choose under its alternative contract theory.

Second, in order for the Standard Contract to constitute an alternative contract, the alternate "acceptance scenarios" must be "mutually agreed upon" as acceptable performance in exchange for the utilities' payment of billions of dollars into the Nuclear Waste Fund. The Government, however, has made no such showing, nor can it. In this litigation the utilities are arguing just the opposite – that in return for the fees DOE collected pursuant to the NWPA, DOE committed to take SNF from utilities at a rate that (1) would eliminate the need for utilities to provide for additional at-reactor storage after 1998 and (2) would begin to work off the backlog of SNF and/or HLW already stored by utilities on-site until 1998. As NYPA demonstrated in its Opposition, in order to meet these twin objectives, the rate must exceed the annual generation rate of 2,000 MTU and an annual steady-state rate of 3,000 MTU is optimum. See NYPA Opposition at 34-35. Stated another way, the Government cannot show that the utilities agreed upon an acceptance scenario that had the Government taking less than 3,000 MTU annually.

Finally, the alternative scenarios must be roughly "equivalent" as compared to the fees contributed by the utilities. As NYPA has previously noted, the evidence produced in this case demonstrates that DOE set the fees charged utilities under the Standard Contract based on a waste management system that would take SNF and/or HLW from utilities at a steady-state rate of 3,000 MTU annually. In addition, the utilities believe an annual acceptance rate of 3,000 MTU best reflects DOE's commitment to utilities under the Standard Contract. Accordingly, in order for the Government's "alternative contract" argument to be credible, the alternative "acceptance scenarios" set forth in the Standard Contract must be the equivalent to DOE taking SNF at an annual rate of 3,000 MTU. An acceptance rate of 900 MTU annually or one spent

fuel rod, however, can hardly be considered equivalent to an acceptance rate of 3,000 MTU annually, the rate "bargained-for" by the utilities.

Close scrutiny reveals, therefore, that the Government is not really arguing that the Standard Contract is an alternative contract. Instead of making the case that the Standard Contract allowed DOE to choose *among* alternative acceptance scenarios identified in the Standard Contract, the Government is really arguing in its Reply that the Standard Contract allowed DOE to choose the alternative acceptance scenarios in the first instance. Accordingly, the Government is arguing what it has argued in this litigation from the beginning: that DOE has unfettered discretion to decide the nature and extent of its performance under the Standard Contract. As NYPA argued in its Opposition, however, such discretion renders DOE's obligations under the Standard Contract, among other things, illusory. See NYPA Opposition at 53-54; Ridge Runner Forestry v. Veneman, 287 F.3d 1058, 1061 (Fed. Cir. 2002) (defining an illusory promise as one that does not put "any limitation on the freedom of the alleged promisor, but leave[s] his future action subject to his own future will, just as it would have been had he said no words at all") (citations omitted). For this reason alone, the Court should reject the Government's interpretation and arguments in this regard as unreasonable. Retail Clerks Int'l Ass'n v. NLRB, 510 F.2d 802, 806 n.15 (D.C. Cir. 1975) ("It is a settled rule of contract interpretation that contract language should not be interpreted to render the contract promise illusory or meaningless.") (citations omitted).

## III. THE DCS FORMS SUBMITTED BY UTILITIES OR THE ACRS ISSUED BY DOE CANNOT FAIRLY FORM THE BASIS FOR THE COURT'S DETERMINATION OF DAMAGES

In its Reply, the Government has altered its position somewhat on the nature and extent of damages to which it believes the utilities are entitled to recover. Whereas initially the

Government argued that damages calculations should only be based on a utility's approved DCS forms, in the Reply and presumably after reviewing the utilities' Opposition arguments, the Government appears to be more generous. Generally speaking, the Government's position is that a utility's damages should be calculated assuming the allocations and the acceptance rates set forth in the 1991, 1992 and 1995 ACRs.

As is discussed in greater detail below, the Court should reject this position for three reasons. First, as explained above, the ACR acceptance rate was unilaterally imposed on the utilities by DOE outside the Standard Contract and was not mutually agreed upon as required by the NWPA. Second, the ACR acceptance rate is illegitimate in that it improperly reflects the Amendments Act MRS capacity limits applied over a twelve-year period. And third, the ACR and DCS processes do not fully capture the losses caused by DOE's breach. Accordingly, the ACR acceptance rate does not begin to fully compensate the utilities for the costs associated with DOE's breach of the Standard Contract.

### A. <u>The ACRs And DCS Forms Reflect An Illegitimate Acceptance Rate</u>

The principal inequity in relying on the ACRs or approved DCS forms in determining damages in this case is that the acceptance rates reflected in the ACRs and submitted DCS forms were the acceptance rates DOE intended to implement for an MRS, subject to the capacity limits set forth in the Amendments Act. As explained in NYPA's Opposition, however, at the time DOE published these rates it knew it could not legally construct an MRS by the 1998 deadline.[13]

[13] In its Reply, the Government argues that "[w]ithout an operational permanent repository available by 1998, the only way that DOE could have begun SNF acceptance in 1998 was through an MRS." Gov't Reply at 68. However, the Government also acknowledges that the Amendments Act precluded DOE from beginning construction of an MRS until the NRC had issued a license for the construction of a repository, an event that was not anticipated to occur until well after 1998. Gov't Reply at 68. Accordingly, both the utilities and DOE knew when

In addition, the rates included in these ACRs were derived by spreading out the Amendments Act's MRS capacity limits over a twelve-year period rather than the three-to-five- year period originally envisioned by Congress. NYPA Opposition at 59-63; PFUF ¶¶ 74, 104-105. These acceptance rates, therefore, appear to have been imposed on the utilities primarily to limit DOE's obligations to utilities in any breach of contract lawsuit, such as the case at bar. Accordingly, the approved DCS forms are a completely inappropriate measure of the utilities' damages as a result of DOE's breach of the Standard Contract.

The Government offers two arguments challenging NYPA's position. The first is that NYPA is wrongly interpreting the Standard Contract to require DOE to have had a repository available in 1998, allegedly in violation of the D.C. Circuit's decision in Indiana Michigan Power Co. v. U.S. Dep't of Energy, 88 F.3d 1272 (D.C. Cir. 1996) ("Indiana Michigan I"). The second argument is that, to the extent NYPA objected to the unilateral imposition of the acceptance rate through the ACR and DCS process actually implemented by DOE, NYPA waived this objection by failing to invoking the Standard Contract's disputes process in 1992. The Government's arguments should be summarily rejected.

**1. The Government Misunderstands NYPA's Position**

The Government justifies the acceptance rates in the 1991, 1992 and 1995 ACRs on the basis that, because DOE was not going to have a repository built by 1998, DOE could only have taken SNF and/or HLW from utilities at an MRS in 1998. Because NYPA has allegedly argued that the Court should measure damages using acceptance rates appropriate for acceptance at a repository, the Government contends that NYPA is arguing that the Standard Contract required

DOE issued the 1991 ACR that DOE would not only *not* be able to accept SNF at a repository, it would also *not* be able to accept SNF at an MRS either.

DOE to have had a repository operational by 1998. The Government argues that imposition of such a requirement violates the D.C. Circuit's holding in Indiana Michigan I.

The Government's argument is specious. NYPA's position is that DOE's obligation to take SNF and/or HLW from utilities by 1998 was not dependent on the existence of a repository in 1998. The D.C. Circuit in Indiana Michigan I, moreover, reached the same conclusion. Indiana Michigan I, 88 F.3d at 1277. Specifically, the court remarked,

> We agree with DOE that Congress contemplated a facility would be available in 1998; however, that Congress contemplated such a facility would be available does not mean that Congress conditioned DOE's obligation to begin acceptance of SNF on the availability of a facility.

Id. However, while the D.C. Circuit in Indiana Michigan I held that DOE's obligation to take SNF and/or HLW from utilities by January 31, 1998 was not "tied to the commencement of a repository," the Government is not free to use the lack of a repository as an excuse for its non-performance. Id. at 1276. As argued by NYPA in its Opposition, the D.C. Circuit's holding in Northern States expressly precludes DOE in this litigation and in the context of determining damages from "advancing any construction of the Standard Contract that would excuse [DOE's] delinquency on the ground that it has not yet established a permanent repository or an interim storage program." Northern States Power Co., 128 F.3d at 756.

In this regard, NYPA objects to DOE's reliance on the MRS acceptance rates in the 1991, 1992 and 1995 ACRs, not because the Standard Contract required DOE to have a repository operational by 1998 but because DOE's only justification for using those rates is the *lack* of a repository. See Gov't Reply at 68 (defending the acceptance rates included in the ACRs by stating, "[w]ithout an operational permanent repository available by 1998, the only way that

DOE could have begun SNF acceptance in 1998 was through an MRS"). NYPA is merely enforcing the D.C. Circuit's holding in Northern States and attempting to ensure that the Government does not "water-down" its obligations to the utilities in this litigation by arguing that a repository was not available. Northern States, 128 F.3d at 759. In addition, NYPA's position is consistent with the Court of Federal Claims' holdings in Commonwealth Edison, Yankee Atomic,[14] Indiana Michigan II, and most recently Southern Nuclear.[15] In Commonwealth Edison, Judge Hewitt flatly rejected the Government's argument that it was "entitled to limit its damages based upon an optional disposal method of which it did not avail itself." Commonwealth Edison, 56 Fed. Cl. at 666. In Yankee Atomic, Senior Judge Merow adopted Commonwealth Edison's reasoning. Yankee Atomic, slip op. at 2 (Fed. Cl. June 26, 2003).[16] Similarly, in Indiana Michigan II Judge Hodges found that measuring the acceptance rate based on the capacity of the MRS created an "artificially low acceptance rate . . . .", which he refused to adopt. Indiana Michigan II, 57 Fed. Cl. at 99.

**2. NYPA Did Not Waive The Right To Challenge The Government's Post-Litigation Characterization Of The ACR And DCS Process**

As for the Government's contention that NYPA "waived" any objection to the acceptance rates in the 1991, 1992 and 1995 ACRs by failing to raise a dispute,[17] this argument, too, misses

---

[14] Yankee Atomic Power Co. v. United States, No. 98-126C (Merow, S.J.). The ruling in Yankee Atomic was deemed to apply in two other cases as well, Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C (Merow, S.J.) and Maine Yankee Atomic Power Co. v. United States, No. 98-474C (Merow, S.J.).

[15] Southern Nuclear Operating Co. v. United States, No. 98-614C (Merow, S.J.).

[16] See also Southern Nuclear, slip op. at 8 (Fed. Cl. Apr. 7, 2004).

[17] It is not at all clear that a dispute regarding the DCS process could have been raised under the Standard Contract's Disputes Clause as argued by the Government. As the Federal Circuit has held, a contractor is only obligated to exhaust administrative remedies under a

the mark. In order for the doctrine of waiver to apply, NYPA would have had to relinquish a known right at the time it submitted its DCS forms. Massie v. United States, 166 F.3d 1184, 1190 n.** (Fed. Cir. 1999) ("A waiver is an intentional relinquishment or abandonment of a known right or privilege.") (citations and quotations omitted). At the time it submitted its DCS forms, however, NYPA and other utilities had no reason to consider the ACR allocations and/or capacity rates contained therein mandatory or binding because DOE clearly stated that they *were not* contractually binding. Similarly, when it submitted its DCS forms NYPA also had no reason to believe it was committing to only deliver the amount of SNF identified in the DCS forms. Indeed, as Judge Hewitt found, "there is no evidence that the exchange of DCSs was intended to create a contract between the parties." Commonwealth Edison, 56 Fed. Cl. at 663.

By the early 1990s, it was obvious that DOE would not take SNF by the 1998 date specified in the Standard Contract. See Yankee Atomic Elec. Co. v. United States, 54 Fed. Cl. 306, 316 (2002) ("From a review of the correspondence submitted by defendant, it is evident that litigation was 'fairly foreseeable' by the agency as early as September 30, 1991 . . . ."). According to DOE's instructions that were issued prior to the utilities' submission of the DCS forms, DOE expressly stated:

> The process described herein assumes that the [federal waste management system] will be able to accept the Purchaser's SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR. In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers.

---

disputes clause where the contract also provides a specific remedy for a particular dispute. Maine Yankee, 225 F.3d at 1340. None of the "schedule terms" cited by the Government provide such a remedy.

Gov't App. at 146; PFUF ¶ 135. Accordingly, not only did NYPA not consider the DCS amounts binding, NYPA also assumed that the DCS forms would have to be revisited once DOE knew when it would be able to begin to accept SNF and/or HLW under the Standard Contract.

NYPA, therefore, had no reason to object to the acceptance rates or the supposed binding nature of the DCS forms, simply because the ACR rates were not considered actual acceptance rates and the DCS forms were not considered binding.[18] Because neither DOE nor NYPA considered the ACR or the DCS forms binding obligations, NYPA cannot be held to have waived its right to object to the Government's characterization of the ACR or the DCS forms as such in this litigation.

**B. By Limiting The Analysis To ACRs and DCSs, Many Utilities Will Not Be Fully Compensated For Their Losses From DOE's Breach**

Another reason the Court should not rely on the ACRs or submitted DCSs in assessing damages in this case is because the ACR and DCS process cannot capture the full extent of the damages created by DOE's breach of the Standard Contract. NYPA has already noted that the acceptance rate identified in the ACRs and submitted DCSs was illegitimate and limited DOE's obligation to utilities to a fraction of what the parties actually intended (i.e., 900 MTU v. 3,000 MTU). In addition, DOE stopped issuing the ACRs in 1995 and unilaterally suspended the DCS process thereafter. The ACRs also only covered a ten-year period, from 1998 to 2007. DOE has publicly announced that it will not begin to take SNF and/or HLW from utilities until 2010, at the earliest. The ACR and DCS process, therefore, does not provide the Court with any

[18] Notwithstanding the Government's assertions to the contrary, the fact that neither NYPA nor DOE considered the ACR rates or the DCS forms binding did not mean that the parties considered that process a "sham" or "meaningless." See Gov't Reply at 32. As noted earlier herein, both the ACR process and DCS process aided the parties in planning, and were necessary in order to facilitate "exchanges" among utilities.

benchmark for damages for years 2007 through 2010 and beyond. For all these additional reasons, the ACR and DCS process established by DOE cannot serve as a basis for calculation of damages in this case.

## IV. THE RECORD SUPPORTS NYPA'S CONTENTION THAT THE INTENT OF THE PARTIES WAS THAT DOE WOULD ADOPT AN ANNUAL ACCEPTANCE RATE OF 3,000 MTU WHEN IT BEGAN TO DISPOSE OF SNF AND/OR HLW UNDER THE STANDARD CONTRACT

In its Opposition and as it does herein, NYPA demonstrates that the acceptance rate is a term missing from the Standard Contract that must be ascertained by the Court through consideration of extrinsic evidence. Specifically, NYPA contends that the record establishes that Congress and the parties intended that DOE would adopt an annual acceptance rate in 1998 that would (1) eliminate the need for the utilities to provide for additional at-reactor storage after 1998 and (2) begin to work off the backlog of SNF and/or HLW already stored by the utilities on-site up until that time.

The Government disagrees with NYPA. According to the Government, the NWPA does not support this position. In addition, while the Government acknowledges that many DOE representatives and DOE documents fully adopt NYPA's view, the Government characterizes these statements as the "hopes" and "aspirations" of DOE and denies that the statements have any contractual significance. Finally, the Government argues that the acceptance rate reflected in the 1991, 1992 and 1995 ACRs, which only ramps up to 900 MTU annually, is a rate that is large enough to ensure that utilities would not have had to provide for additional at-reactor storage after 1998. As is explained in greater detail below, each of the Government's arguments is without merit.

### A. The NWPA's Findings Are Consistent With The Parties' Intent That The Utilities Would Not Have To Build Any Additional At-Reactor Storage And That The Backlog Would Begin To Be Eliminated After 1998

The Government complains that the NWPA does not specifically state in its findings that one of its purposes was to avoid the need for utilities to provide for additional on-site storage after 1998 and to begin to eliminate the backlog of SNF and/or HLW stored on-site as of that date. The Government is correct that the NWPA does not contain these specific findings. The Government agrees, however, that one of the principal purposes of the NWPA was the protection of the public from the "hazards posed by SNF and HLW." See Gov't Reply at 56 ("ample legislative history details that one of the main goals of the Act was to protect the public health and safety"); see also 42 U.S.C. § 10131(b)(1) (2000) (stating that the NWPA's purpose was to "provide a reasonable assurance that the public and the environment will be adequately protected from the hazards of nuclear waste").

Among the "hazards of nuclear waste" to which Congress was referring in the NWPA was "the sudden and unanticipated liability in the form of spent fuel stored at reactor sites with no near-term destination" which resulted when the Government eliminated reprocessing as an alternative for disposing of SNF and/or HLW. H.R. Rep. No. 97-491, pt. 1 (1982), Pl. App. at 233; PFUF ¶ 5; see also 42 U.S.C. § 10131(b)(1) (2000) (reflecting Congressional recognition that "a national problem had been created by the accumulation of . . . spent nuclear fuel from nuclear reactors"). As Representative Michel explained in urging Congress to pass the NWPA:

> The need for producing a coherent plan for nuclear waste management is urgent. Spent fuel storage congestion is now rapidly building up at power reactor sites, a situation that will become absolutely critical . . .

128 Cong. Rec. 26,311 (1982); PFUF ¶ 7; see also Mission Plan for the Civilian Radioactive Waste Management Program (June 1985), Pl. App. at 311; PFUF ¶ 61 ("The growing accumulation of [SNF] in temporary storage poses potential health and safety problems for the public.").

Thus, in passing the NWPA Congress clearly intended to address the accumulation of SNF and/or HLW at nuclear reactor sites and to do it by a date certain: January 31, 1998. See, e.g., Remarks of Rep. Bereuter, 128 Cong. Rec. 27,775 (1982) ("Waste storage cannot continue in the temporary, unsafe fashion that it has maintained for these decades."). Similarly, preventing additional on-site storage and reducing the backlog of SNF and/or HLW already accumulated on-site is certainly consistent with Congress' intent, explicitly identified in the NWPA, that the public and the environment be protected against the hazards of nuclear waste.[19] As Judge Hodges found, "Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials." Indiana Michigan II, 57 Fed. Cl. at 99. Indeed, "[t]he parties understood that utilities were not to store additional waste on site after 1998. This was Congress' purpose in passing the Nuclear Waste Policy Act, and it was the parties' intent in signing the Standard Contract." Id.

---

[19] Indeed, several directors of DOE's Office of Civilian Radioactive Waste Management ("OCRWM") concurred with this view. For example, Robert Morgan, the first Director of OCRWM stated that the "intent of Congress" was that "beginning in 1998 utilities will not have to provide any additional storage facilities on site." Morgan Dep., Pl. App. at 93; PFUF ¶ 12. The second Acting Director of OCRWM, likewise, testified before Congress that achieving the "fundamental objective" of the NWPA would "initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1988" and ultimately remove all eligible waste from at-reactor storage. Lawrence Dep., Pl. App. at 80; PFUF ¶ 13.

**B. DOE's Pre-Litigation Conduct Is The Best Evidence Of Its Intent As To How It Planned To Implement An Acceptance Schedule And, Therefore, Such Conduct Is Significant To The Court's Interpretation Of The Standard Contract**

The Government does not attempt to deny that several key DOE representatives and numerous documents published by DOE over the last two decades have concurred with NYPA's contention that two primary objectives of the NWPA and the Standard Contract were (1) to eliminate the need for utilities to provide additional SNF and/or HLW storage on-site after January 31, 1998 and (2) to begin to work off the backlog of SNF and/or HLW stored on utility sites up until that time. DOE representatives and DOE program documents also indicate that an annual acceptance rate of 3,000 MTU was and is the rate most likely to achieve both these objectives. The Government argues, however, that the oral and written representations made by DOE were not contractually binding but rather were mere statements of DOE's "hopes" and "objectives" for the civilian radioactive nuclear waste program.

The Government's response misses the point. NYPA is not arguing that DOE's oral and written statements over the past two decades themselves establish a contractual obligation on the part of DOE to accept SNF and/or HLW at a particular acceptance rate or according to a specific schedule.[20] As clearly stated in its Opposition and herein, NYPA's position is that an acceptance

[20] The cases cited by the Government on this point, therefore, are irrelevant. See, e.g., Nat'l By-Products, Inc. v. United States, 405 F.2d 1256 (Ct. Cl. 1969). In National By-Products, the plaintiff argued that the Government promised to build a levee along a creek. A contract for the construction of a levee did not exist and the issue before the Court was whether the Government's representations created a contract in fact. The court held that they did not. In analyzing the evidence for this purpose, however, the court noted that an easement granting the Government access to the creek contained references to construction of a levee. The court further stated that, had this document had other terms that "would ordinarily be present" in a contract, some of the other "deficiencies could [have been] remedied by implying 'reasonable' terms." Id. at 1266 n.9. Thus, this case actually supports NYPA's position that, where a contract is otherwise integrated and definite, the Court may properly consider extrinsic evidence – such as the parties' representations – to fill in a missing term.

rate obligating DOE to accept SNF and/or HLW at a specific rate from NYPA and other utilities is missing from the Standard Contract and should be determined by the Court.[21] The fact that these past DOE statements and conduct may not be contractually binding, however, does not make them insignificant or irrelevant to the Court's inquiry.

Although the Government now dismisses these DOE oral statements and published documents as nothing more than hortative aspirations, these DOE statements amount to clear evidence of DOE's conduct, intentions, and plans with respect to accepting SNF and/or HLW pursuant to the Standard Contract.[22] As stated in NYPA's Opposition, in determining an appropriate acceptance rate the Court should seek to effectuate the intention of the parties. Alvin Ltd. v. United States Postal Serv., 816 F.2d 1562, 1565 (Fed. Cir. 1987). In this regard, the parties' respective interpretation and performance of a contract "before the advent of controversy, is often more revealing than the dry language of the written agreement by itself." Macke Co. v. United States, 467 F.2d 1323, 1325 (Ct. Cl. 1972); see also Crown Laundry & Dry

[21] In this regard, the Standard Contract is only partially integrated. See Restatement (Second) of Contracts § 204, cmt. e (1981) ("[t]he fact that an essential term is omitted may indicate that . . . there is partial rather than complete integration"). Where a contract is only partially integrated, the integration clause does not bar the Court's consideration of extrinsic evidence.

[22] The Government objects to NYPA's reference to DOE's past fee adequacy studies and total system life cycle cost analyses, commenting that these are "not appropriate documents to use to determine the parties' contractual 'intent'." Gov't Reply at 65. For example, the Government complains that these documents "have nothing to do with the goals of the Standard Contract or the SNF program . . . ." Id. In making such statements, the Government ignores the reciprocal nature of the parties' obligations under the Standard Contract. In Indiana Michigan I, the D.C. Circuit held that the NWPA created an obligation in DOE, reciprocal to the utilities' obligation to pay, to begin to dispose of SNF and/or HLW no later than January 31, 1998. Any other interpretation, the Court concluded, "destroys the *quid pro quo*" created by Congress. Indiana Michigan I, 88 F.3d at 1276. In this case the evidence demonstrates that DOE set the fees charged utilities based on a waste management system that would take SNF and/or HLW from utilities at a steady state rate of 3,000 MTU annually. DOE's reciprocal obligation, therefore, is to have actually taken SNF and/or HLW at an annual rate of 3,000 MTU had it begun to dispose of SNF and/or HLW by January 31, 1998.

Cleaners, Inc. v. United States, 29 Fed. Cl. 506, 516 (1993) ("there is no surer way to find out what the parties meant, than to see what they have done") (quoting Ins. Co. v. Dutcher, 95 U.S. 269, 273 (1877)). Thus, while DOE's past statements and representations may not be considered equivalent to contractual obligations, they are vital in determining DOE's intent with respect to the acceptance rate it planned to adopt when it began to dispose of SNF and/or HLW under the Standard Contract.[23]

Furthermore, the Court of Federal Claims has previously rejected arguments by the Government that the Court should give little weight to DOE's prior representations regarding an annual acceptance rate of 3,000 MTU. For example, according to Judge Hodges, even if the 3,000 ton rate was just a goal or a target and not a contract term:

> [i]t is the number most often used by Congress and by parties to the Standard Contract. It is a reasonable and responsible rate that represents the parties' intent. It accomplishes the purposes of the Nuclear Waste Policy Act and the Contract authorized by that statute.

Indiana Michigan II, 57 Fed. Cl. at 99. Moreover, Judge Hodges found that the record in Indiana Michigan II, which essentially is the same record as in this case, "contains uniform support" for the assertion that DOE believed that acceptance of SNF and/or HLW at a steady state rate of 3,000 MTU annually was necessary to address the goals of preventing additional on-site storage after 1998 and to begin to eliminate the on-site backlog of SNF and/or HLW. Id. Accordingly,

[23] Curiously, the Government complains that many of the documents cited in NYPA's Opposition are irrelevant because the acceptance rates discussed therein relate to the design of the repository. The fact that the acceptance rates reflect acceptance at a repository does not make these documents irrelevant; after all, as the D.C. Circuit noted in Indiana Michigan I, Congress initially contemplated that DOE would accept SNF at a repository in 1998. 88 F.3d at 1277. In addition, these documents are relevant because they demonstrate that DOE designed the facility to accommodate a waste acceptance rate that ramped up to 3,000 MTU annually.

Judge Hodges denied the Government's partial motion for summary judgment on the acceptance rate issue and granted plaintiff's summary judgment cross-motion, finding that an annual steady state acceptance rate of 3,000 MTU was an appropriate basis on which to compute the plaintiff's damages resulting from DOE's breach of the Standard Contract.[24] Indiana Michigan II, 57 Fed. Cl. at 99. The Court should make a similar finding here.

**C. The Acceptance Rates In The 1991, 1992 And 1995 ACRs Do Not Satisfy The Twin Objectives Of The NWPA And The Standard Contract**

The Government introduces yet another new argument in its Reply in which it contends that the acceptance rates included in the 1991, 1992 and 1995 ACRs actually satisfy the objectives of the NWPA and the Standard Contract as articulated by NYPA. Not quite. The Government admits that these acceptance rates do not address the need to work off the backlog of SNF and/or HLW stored on-site at nuclear reactors.[25] The Government also admits that the acceptance rates contained in the 1991, 1992 and 1995 ACRs only address the nuclear industry's storage needs *in the aggregate*; that is, individual nuclear reactor sites may have storage needs that may not be addressed by the acceptance rates and allocations set forth in those ACRs. Specifically, the acceptance rates listed in the 1991, 1992 and 1995 ACRs will only address the

[24] Judge Hewitt, in Commonwealth Edison, held that the plaintiff's evidence regarding a 3,000 MTU annual acceptance rate was persuasive enough to overcome the Government's motion for partial summary judgment on the acceptance rate issue. While Judge Hewitt ruled that because plaintiff had not filed a cross-motion for summary judgment the court would have to determine the acceptance rate in further proceedings, Judge Hewitt did find that the evidence supported plaintiff's argument that 3,000 MTU was the acceptance rate needed to achieve the objectives of the NWPA. Commonwealth Edison, 56 Fed. Cl. at 667. In Yankee Atomic and Southern Nuclear, Senior Judge Merow similarly denied the Government's partial motion for summary judgment concerning the acceptance rate, also finding that the issue must be resolved by evidentiary proceedings. Yankee Atomic, slip op. at 2; Southern Nuclear, slip op. at 8.

[25] As explained in NYPA's Opposition, in order to begin to work off the backlog of SNF stored at utility sites in 1998, DOE would have had to implement an acceptance rate that, at a minimum, exceeded the annual generation rate of SNF, which is about 2,000 MTU. See NYPA Opposition at 34-35.

industry's storage needs as a practical matter if a perfect "exchange" process existed where utilities with early positions in the queue and excess storage capacity would freely and always trade their place in the queue with utilities with positions later in the queue and less storage capacity. If one utility did not care to exchange its preferred position in the queue, however, the aggregate industry need would not be met.[26] Accordingly, while the rates included in the 1991, 1992 and 1995 ACRs might address the nuclear industry's storage needs in theory, it was extremely unlikely that these rates would have satisfied those needs in practice.

## V. THE GOVERNMENT'S ARGUMENTS IN ITS SUPPLEMENTAL BRIEF ARE NOT PERSUASIVE

### A. The Court Of Federal Claims' Prior Decisions Do Not Render The Standard Contract Impossible To Perform

In its May 10, 2004 Supplemental Brief, the Government urges the Court to depart from recent decisions by this Court in Commonwealth Edison, Indiana Michigan II, Yankee Atomic, and Southern Nuclear denying the Government's partial motions for summary judgment as to the acceptance rate, because those decisions allegedly "do not consider the practicalities of the acceptance of SNF necessitated by the Standard Contract." Gov't Supp. Br. at 1.

According to the Government, the Commonwealth Edison Court's rationale – which was adopted by Senior Judge Merow in Yankee Atomic and in Southern Nuclear – renders the Standard Contract's DCS provisions "meaningless" because it rejected the Government's

[26] For example, while some utilities with positions early in the queue may have had some excess storage capacity, given the growing uncertainty of when DOE would perform its obligation under the Standard Contract, many of these utilities, in an abundance of caution, may have been unwilling to give up their preferred positions in the queue. In addition, other utilities may have had local or state restrictions limiting the utility's ability to store SNF on-site. Finally, state or local political considerations may have made it practically impossible for some utilities to trade away positions early in the queue in light of concerns about DOE's history of non-performance.

arguments that the schedule provisions contained in the Standard Contract provided the mechanism for determining the SNF acceptance rate. Gov't Supp. Br. at 1-3. The Government claims, therefore, that Commonwealth Edison makes the Standard Contract "virtually impossible to perform." Id. at 3. The Government adds that, together with Judge Hodges' holding in Indiana Michigan II, those decisions "eliminate the existing schedule terms from the Standard Contract," leaving the Standard Contract without a mechanism for determining how DOE would accept SNF and/or HLW. Id. at 4. The Government's arguments mischaracterize this Court's previous findings, and greatly exaggerate the impact of those decisions upon DOE's ability to administer the Standard Contract.

Contrary to the Government's position, the Commonwealth Edison, Yankee Atomic, Southern Nuclear, and Indiana Michigan II decisions do not render meaningless or eliminate the ACR and DCS "schedule terms" contained in the Standard Contract. Rather, those decisions found that the manner in which the Government manipulated the ACR and DCS procedures was inconsistent with the Standard Contract and, therefore, could not form the basis for establishing the acceptance rate to be used when determining the plaintiff's damages. Had DOE established a DCS process based upon an annual 3,000 MTU acceptance rate, there would have been no dispute. Only DOE's improper limitation on the annual acceptance rate need be modified to put the Standard Contract process back on a proper foundation.

For example, according to the Commonwealth Edison decision, DOE may have breached its duty of good faith and fair dealing when it insisted that the total quantities of SNF designated on a DCS could not exceed the ACR allocation. Commonwealth Edison, 56 Fed. Cl. at 665. The Court in Commonwealth Edison noted other problems with DOE's implementation of the ACR and DCS procedures, such as DOE's disapproval of the plaintiff's DCS submission for

2002 and its failure to respond to plaintiff's 2001 and 2003 submissions. Id. Judge Hewitt also pointed out that, in 1997, DOE notified utilities that it was waiving their obligation to submit revised DCSs because DOE was unable to approve or disapprove such submissions. Id. In addition, Judge Hewitt stressed that there was no evidence that the plaintiff ever submitted, or DOE ever approved, a Final Delivery Schedule as required under the Contract. Id. Thus, Judge Hewitt found, "[e]ven if the process . . . could, if followed and completed in good faith, create a contractual obligation, the third step in the process was not completed because plaintiff did not submit and defendant did not approve a FDS for any year." Id. at 666. It was for these reasons, and not because the ACR and DCS procedures were "meaningless," that the Commonwealth Edison decision rejected the Government's argument that those procedures should be used to establish an acceptance rate for measuring a plaintiff's damages.[27]

The Court in Indiana Michigan II was similarly critical of how DOE used the ACR and DCS procedures to improperly limit the amount of SNF that utilities included in their DCSs. As that decision points out, although the Standard Contract required the plaintiff to identify the SNF that it expected DOE to remove, "[t]he Contract did not authorize the Department of Energy to limit its obligations to the utilities by applying statutory limitations that did not exist." Indiana Michigan II, 57 Fed. Cl. at 98. The Court added: "[t]he Contract does not suggest that approval [of DCSs] would be based upon Annual Capacity Reports," as DOE required. Id. Accordingly, Judge Hodges found that DOE improperly used the Standard Contract's "schedule terms" to limit plaintiff's substantive rights by issuing instructions limiting the plaintiff to "less than a third of the anticipated acceptance rate . . . ." Id. Like Judge Hewitt in Commonwealth Edison, Judge

[27] The Court in Yankee Atomic adopted the "well reasoned" decision of Commonwealth Edison regarding the acceptance rate; it did not provide a detailed discussion of the issue. Yankee Atomic, slip op. at 2.

Hodges in Indiana Michigan II rejected the Government's arguments regarding the ACR and DCS procedures because DOE unfairly manipulated those procedures to establish an unreasonably low acceptance rate, not because the ACR and DCS provisions of the Standard Contract were to be ignored.[28] In fact, under those decisions the Standard Contract's ACR and DCS "schedule terms," properly implemented, could still provide the *planning mechanism* (including identifying the location, type, and characteristics of SNF to be delivered to the Government within a certain time period) for deliveries at the appropriate annual rate of delivery.

Moreover, it is clear that the ACR and DCS "schedule terms" were never meant to be used to establish the acceptance rate. The Government repeatedly has recognized as much throughout this case.[29] Judge Hewitt has agreed, stating: "[n]or does the DCS submission process in Article V of the Standard Contract contain language which indicates that the DCS process is intended to create a binding acceptance rate for the parties." Commonwealth Edison, 56 Fed. Cl. at 662. Judge Hodges made a similar finding in Indiana Michigan II, succinctly holding: "[t]he Contract does not use Annual Capacity Reports and Delivery Commitment Schedules to determine an Acceptance Rate." Indiana Michigan II, 57 Fed. Cl. at 98 (footnote omitted).

**B. The 3,000 MTU Acceptance Rate Is Supported By The Record**

The Government's Supplemental Brief also argues that the Indiana Michigan II decision improperly inserted a 3,000 MTU annual rate of delivery into the Standard Contract. Gov't Supp

[28] The Government also argues that the Indiana Michigan II Court "ignore[s] . . . agreements that DOE and numerous utilities had already made." Gov't Supp. Br. at 4. Presumably, the Government is arguing that the DCS process created agreements regarding the acceptance rate. As set forth in Sections II.A. and B. *supra*, it is clear that the ACR and DCS procedures were not binding; they did not create contractual arrangements between the parties.

[29] See Section II.D., *supra*.

Br. at 4. According to the Government, the Court in Indiana Michigan II had no basis for inserting that term, nor did it have support for its assertion that Congress and the parties anticipated that DOE would collect fuel at a rate sufficient to eliminate the need for additional on-site storage capacity and to reduce the backlog of previously-stored materials. Id. at 3-4. The Government's arguments are meritless.

The Court in Indiana Michigan II cites ample support for its findings regarding the 3,000 MTU delivery rate. According to Judge Hodges, "the record contains uniform support" for the plaintiff's assertions that:

> [N]early every document published by DOE throughout the history of the nuclear waste program reflects DOE's intention to take SNF and/or HLW at a rate that ramps up to 3,000 MTU annually once DOE actually begins to dispose of SNF and/or HLW under the Standard Contract. Multiple DOE witnesses confirmed that DOE believed that acceptance of SNF and/or HLW at a steady state rate of 3,000 MTU annually was necessary to prevent additional on-site storage after 1998 and to begin to eliminate the accumulated backlog of SNF and/or HLW on-site.

Indiana Michigan II, 57 Fed. Cl. at 99. Judge Hodges adds: "the evidence shows clearly that . . . [a 3,000 MTU] rate was the minimum needed" to meet Congress' and the parties' objectives under the NWPA and the Standard Contract. Id. Judge Hodges expressly acknowledges that his decision did not attempt to discuss "the entire record support" for the 3,000 metric ton annual rate of delivery. Id. The language quoted above, however, makes it plain that Judge Hodges believed there was overwhelming evidence upon which to base his decision.

The Government's argument challenging the 3,000 MTU rate relies upon its claim that DOE did not contractually bind itself to such an acceptance rate. Gov't Supp. Br. at 3-4. On this

basis, the Government criticizes this Court for "insert[ing] its own term into the Standard Contract." Id. at 5. This argument is merely a restatement of the Government's position, set forth in its Reply, that the countless statements and representations made by DOE representatives and in DOE's documents regarding the efficacy of the 3,000 MTU rate were and are not contractually binding. As discussed in Section IV.B. of this brief, however, whether such information is contractually binding is besides the point; rather, that information is important to the Court's interpretation of the Standard Contract because it is significant, probative evidence regarding the manner in which the parties interpreted the contract before the controversy arose. See Macke, 467 F.2d at 1325; Crown Laundry, 29 Fed Cl. at 516.

**C. This Court Is Obligated To Supply The Missing Acceptance Rate Term**

The Government's Supplemental Brief raises a number of arguments to support its claim that the Contract is unenforceable without an acceptance rate term. These arguments are not persuasive.

First, the Government's Supplemental Brief states that "[a] court cannot make contracts for the parties." Gov't Supp. Br. at 5. The Indiana Michigan II, Commonwealth Edison, Yankee Atomic, and Southern Nuclear courts, however, did not "make" contracts for the parties. They merely applied well-recognized contract interpretation principles to resolve a dispute. Of course, interpretation of a contract begins with analyzing the plain language of the written agreement. Hercules, Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002). It is clear, however, that when an essential term is missing from a contract, it is the court's function to supply such a term. See David Nassif Assocs. v. United States, 644 F.2d 4, 5 (Ct. Cl. 1981) ("Normally, the task of supplying a missing, but essential term . . . is the function of the court"); see also First

Nationwide Bank v. United States, 48 Fed. Cl. 248, 263 (2000); Howell v. United States, 51 Fed. Cl. 516, 520-21 (2002).

Second, the Government claims that an "agreement to agree" on essential contract terms, such as the acceptance schedules, is "unenforceable" because there is not "mutuality of intent and sufficient definiteness" to form a contract. Gov't Supp. Br. at 5-6. Incredibly, this argument directly contradicts the Government's position in its Reply. There, the Government claimed that the parties made an *enforceable* "agreement to agree" on the acceptance schedule. According to the Government's Reply, "that portion of the schedule terms through which the parties agreed to attempt to agree to specific acceptance schedule amounts and dates creates an obligation, upon both parties, to attempt to agree in good faith upon specific delivery and acceptance commitments." Gov't Reply at 26. The Government even cited case law to support its argument that an agreement to agree is "sufficiently definite" to be enforceable. Id.

This Court, however, need not resolve the Government's disagreement with its own previously staked out positions. As NYPA explains in Section II.C. *supra*, there was no agreement to agree on the acceptance rate, nor has NYPA ever argued that one existed; rather, NYPA has consistently maintained throughout this proceeding that the acceptance rate term was missing from the agreement. In this regard, the Court of Federal Claims has validated NYPA's position. See Indiana Michigan II, 57 Fed. Cl. at 96 (the acceptance rate term "is missing entirely" from the Contract); Commonwealth Edison, 56 Fed.Cl. at 667 (finding that the Court was required to determine "the missing acceptance rate term . . . .").

Third, the Government claims that the acceptance rate term is so essential to the Standard Contract that rejection of the Government's arguments regarding the ACR and DCS procedures

would "render the Standard Contract too indefinite to enforce." Gov't Supp. Br. at 6-7. In support of that argument, the Government claims that if an essential term "is one of the central aspects" or "is one of the most essential terms of" a contract, it cannot be provided by the Court. Id. at 7. This Court, like the Indiana Michigan II, Commonwealth Edison, Yankee Atomic, and Southern Nuclear Courts, should reject the Government's position.

When determining whether a contract is too indefinite to be enforced, a court first looks to whether the parties intended to create a contract. Aviation Contractor Employees, 945 F.2d at 1572 (Fed. Cir. 1991) (citing, 1A. Corbin, Corbin on Contracts § 97 (1963) ("once it is determined that the parties did indeed intend to create a contract, courts should be slow to deny enforcement on the basis of indefiniteness in the contract"). Thus, even the omission of the contract's price, usually a contract's most essential term, "does not vitiate contract formation if the parties otherwise manifested their mutual assent to the agreement and the terms of that agreement are sufficiently definite." Atacs Corp. v. Trans World Communications, Inc., 155 F.3d 659, 667 (3d Cir. 1998). Although the acceptance rate term is missing from the Contract, the most critical obligations – NYPA's obligation to pay money into the Nuclear Waste Fund and DOE's corresponding obligation to begin disposing of SNF as of January 31, 1998 – are clearly set forth in the Standard Contract and are sufficiently definite to make the contract enforceable.[30]

[30] In this regard, NYPA has not argued that the Contract's written provisions are to be ignored in any way, but instead is merely advocating incorporation of DOE's 3,000 MTU steady-state rate of acceptance to determine the damages in this case (rather than the artificially low rate DOE concocted based on the non-existent MRS). Indiana Michigan II, 57 Fed. Cl. at 98. The Government has cited two inapposite cases for the principle that the contract is unenforceable, absent the use of the Government's artificially low acceptance rate. Massengill v. Guardian Mgmt. Co., 19 F.3d 196, 202, 205 (5th Cir. 1994) (finding that various contract formation documents were too contradictory to allow the court to conclude a contract between

There simply is no plausible basis for this Court to find that the parties to the Standard Contract did not intend to enter into a contract, or that the parties' obligations thereunder were too indefinite to be enforceable. The NWPA directed the parties to enter into contracts to formalize the Government's obligation to dispose of SNF and/or HLW. Accordingly, every commercial nuclear utility in the United States did just that. For more than 20 years, utilities have paid, and continue to pay, in excess of $10.5 billion into the Nuclear Waste Fund pursuant to the Standard Contract. See Alabama Power, 307 F.3d at 1303. Moreover, the D.C. Circuit has recognized that the Standard Contract created an "unconditional" obligation on the part of the Government: to collect utilities' nuclear waste. Indiana Michigan I, 88 F.3d at 1276-77; Northern States Power, 128 F.3d at 759-60. The Federal Circuit in Maine Yankee likewise found that DOE had an obligation under the Contract, which it breached, by not beginning to accept, transport and dispose of SNF by January 31, 1998. Maine Yankee, 225 F.3d at 1343. These decisions remove any possible doubt concerning whether the Standard Contract is enforceable.

As the Restatement (Second) of Contracts § 204 (1981) states:

> When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

---

the parties was formed); Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1305-06 (Fed. Cir. 1998) (concluding that the parties entered into a contract that was neither a requirements contract nor an indefinite quantity contract and, thus, the Court would not insert Federal Acquisition Regulation standard clauses to transform the contract into either a requirements contract or indefinite quantity contract). NYPA's case is distinguishable from those cases because NYPA and DOE clearly intended to enter into a contract, and there is uncontradicted evidence that the intent of the parties was to use a 3,000 MTU steady-state rate for the removal of SNF and/or HLW.

For the reasons set forth above, it is clear that the parties entered into a bargain "sufficiently defined to be a contract." Accordingly, this Court is now required to provide the missing acceptance rate term. See Indiana Michigan II, 57 Fed. Cl. at 99; Commonwealth Edison, 56 Fed. Cl. at 667.

## CONCLUSION

For the reasons set forth in NYPA's Opposition and herein, NYPA respectfully requests that the Court deny the Government's request for partial summary judgment on the rate of spent nuclear fuel acceptance and grant NYPA's cross-motion for partial summary judgment on the acceptance rate.

Dated: May 20, 2004

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Jack Y. Chu

Alex D. Tomaszczuk
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
Power Authority of the State of New York

Of Counsel:

Jay E. Silberg
Devon E. Hewitt
Michael G. Lepre
Daniel S. Herzfeld
Jack Y. Chu
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20007
(202) 663-8000
(202) 663-8007 (fax)